IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ABERCROMBIE & FITCH STORES, INC.,**

   **Plaintiff,**

v.

**AMERICAN COMMERCIAL CONSTRUCTION, INC., et al.,**

   **Defendants.**

Case No. 2:08-cv-925

**JUDGE EDMUND A. SARGUS, JR.**

## OPINION AND ORDER

This interpleader action is before the Court for consideration of cross motions for summary judgment filed by Defendants the Internal Revenue Service ("IRS") and Richard Annen. (Docs. 75 and 76.) For the reasons that follow, the IRS's motion is **GRANTED**, and Annen's motion is **DENIED**.

**I.**

Plaintiff Abercrombie & Fitch Stores, Inc. ("Abercrombie") admits that it owes certain funds in the amount of $200,521.37 (the "Funds") for work performed by Defendant American Commercial Construction, Inc. ("ACC"). (Am. Compl. ¶ 9.) In addition to ACC, multiple parties asserted a claim to the Funds, including Defendants IRS, Richard J. Annen, Timothy Cupps, Primary Funding Corporation, Gianarelli, Inc., and Paul D. Mendelson.[1] On October 7, 2008, Abercrombie filed this interpleader action pursuant to Rule 22, asking the Court to determine Abercrombie's liabilities regarding the Funds, which Abercrombie deposited into the

---

[1] The Court has already determined that the IRS's lien is superior to that of Timothy Cupps (Doc. 83), and Primary Funding Corporation denied that it has an interest in the Funds and was dismissed from the case (Docs. 12, 24). Gianarelli, Inc. and ACC failed to appear in this action, with the result that the Clerk entered a default against each of them. (Docs. 34, 35.)

registry of the Court on April 30, 2009. Both the IRS and Annen have moved for summary judgment, each asserting that they have a superior claim to the Funds.

The IRS's claim is based on a Notice of Federal Tax Lien that the IRS filed with the California Secretary of State (the "Secretary") against ACC on June 2, 2008, in the total amount of $805,714.09. (IRS Mot. Ex. B.)

Annen's claim is based on a Purchase and Sale and Security Agreement dated July 28, 2008 (the "PSSA") whereby ACC sold to Annen certain accounts receivable of Abercrombie. (IRS Mot. Ex. C.) The PSSA provided:

> ACC shall sell to Annen $165,000 of the existing and future Accounts of Abercrombie & Fitch (some of which are identified on Exhibit A hereto) and Annen shall purchase such Accounts from ACC for $150,000. The Accounts, including those listed on Exhibit A, which are in excess of $165,000 shall serve as security for payment of the $165,000. Any amounts received by Annen from the Accounts in excess of $165,000 shall be immediately paid to ACC.

(*Id.*) While the PSSA is dated as of July 28, 2008, Annen states in his declaration that it was not executed until August 29, 2008 because ACC had to prepare Exhibit A identifying the covered accounts receivable. (Annen Decl. ¶ 4, Ex. 2 (PSSA with Exhibit A).) Also on August 29, 2008, Annen filed with the Secretary a UCC financing statement against ACC securing ACC's accounts receivable and other assets. (IRS Mot. Ex. D.)

## II.

The Government and Annen have filed cross motions for summary judgment under Civil Rule 56. That rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v.*

2

*Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.*, 489 F.3d at 279–80 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## III.

### A.     Priority of Federal Tax Lien

If a taxpayer fails to pay a tax that is owed and demanded, a federal tax lien in the amount owed is automatically created against all of the taxpayer's property under 26 U.S.C. § 6321. "[O]nce the tax lien has attached to the taxpayer's state-created [property] interests . . . federal law . . . determines the priority of competing liens." *Aquilino v. United States*, 363 U.S. 509, 513–14 (1960). "Federal tax liens do not automatically have priority over all other liens. Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that 'the first in time is the first in right.'" *United States by & ex rel. IRS v. McDermott*, 507 U.S. 447, 449 (1993) (quoting *United States v. New Britain*, 347 U.S. 81, 85 (1954)).

A federal tax lien becomes enforceable—and valid for the purpose of "first in time" priority—simply upon the filing of a Notice of Federal Tax Lien. 26 U.S.C. § 6323(a); *McDermott*, 507 U.S. at 449. Pursuant to 26 U.S.C. § 6323(a), "the filing of notice renders the federal tax lien extant for 'first in time' priority purposes regardless of whether it has yet attached to identifiable property." *McDermott*, 507 U.S. at 453.

In this case, the IRS obtained an effective lien over ACC's assets when it filed a Notice of Federal Tax Lien on June 2, 2008. As for the subsequent transfer of certain ACC assets to Annen in the PSSA, "[i]t is settled federal law that transfers subsequent to the attachment of a

3

federal lien do not affect the lien in any way." *United States v. Big Value Supermarkets*, 898 F.2d 493, 497 (6th Cir. 1990) (citing *United States v. Bess*, 357 U.S. 51, 57 (1958)); *Paternoster v. United States*, 640 F. Supp. 2d 983, 991 (S.D. Oh. 2009) (citing *United States v. Rodgers*, 461 U.S. 677, 691 n.16 (1983)). Nor does Annen's UCC statement, filed on August 29, 2008, have priority over the earlier-filed tax lien under the "first in time" rule. Applying the basic principles discussed above, the IRS has the superior lien, and its claim is superior to Annen's claim.

## B. Equitable Estoppel

Annen contends, however, that the IRS is estopped from asserting its claim over the funds because the IRS and ACC allegedly entered into an agreement that the IRS would not undertake collections as long as ACC fulfilled certain obligations. (Annen Mot. 16.)

### 1. *Elements of Estoppel*

The Sixth Circuit has explained:

> Estoppel is an equitable doctrine which a court may invoke to avoid injustice in particular cases. The traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel. The government, however, may not be estopped on the same terms as any other litigant. Rather, [a] party attempting to estop the government bears a very heavy burden. At a minimum, the party must demonstrate some affirmative misconduct by the government in addition to the other estoppel elements.

*Mich. Express, Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004) (quoting *Fisher v. Peters*, 249 F.3d 433, 444 (6th Cir. 2001); *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000); *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984); *Fisher v. Peters*, 249 F.3d 433, 444 (6th Cir. 2001)) (quotations omitted).

The reasonable reliance element requires that "the party claiming the estoppel did not know nor should . . . have known that its adversary's conduct was misleading." *Heckler v. Community Health Servs.*, 467 U.S. 51, 59 (1984). "If, at the time when [the party asserting

4

estoppel] acted, [he] had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." *Id.*, 467 U.S. at 59 n.10.

As for the final element, the requisite "'affirmative misconduct' is more than mere negligence. It is an act by the government that either intentionally or recklessly misleads the claimant. The party asserting estoppel against the government bears the burden of proving an intentional act by an agent of the government and the agent's requisite intent." *Mich. Express*, 374 F.3d at 427. Estoppel does not apply where "[t]he government was not attempting to trick" the party asserting estoppel, but was rather "attempting, in good-faith, to advise [the party] as to its intended course of action based on the facts that it knew," and not acting with malicious intent. *Id.*, 374 F.3d at 428.

### 2. *The Evidence Presented*

Annen presents the following evidence in support of the IRS's alleged agreement not to undertake collections as long as ACC fulfilled certain obligations. IRS records show that on several occasions in January and March of 2008, IRS Revenue Officer Erin Kelly warned ACC's agent that if ACC failed to keep various commitments, the IRS would undertake various collections-related actions. These records, in the form of notes and letters by the revenue officer, are as follows:

> I advised [ACC's agent with a power of attorney, John Sunnen] that if he fails to keep commitments set for 1//31/2008 (sic), I will proceed with preparing returns under IRC 6020(b) in order to pursue collection action. [Sunnen] acknowledged his commitments and understands the consequences.

(Notes, Jan. 24, 2008, Annen Decl. Ex. 1 at US617.)

5

> [ACC's] [f]ailure to [bring tax deposits current for this quarter and provide proof of those deposits] could result in a requirement to file monthly employment tax returns and/or open a special bank account for withheld funds.
>
> . . .
>
> Failure to provide the documents I have requested . . . and failure to have the other information available and persons with authority present to discuss these issues, could result in preparation of returns in accordance with IRC 6020(b), summons of third parties, summons of officers and other employees, change in filing requirements to monthly, requirement to establish a special bank account and possible future levy and seizure actions.

(Letter, March 3, 2008, Annen Decl. Ex. 1 at US556–US557, US558.)

> Emphasized potential for monthly filing, special bank account and pursuit of injunction if [ACC] fails to comply with filing and deposit requirements.
>
> . . .
>
> [A]dvised that failure to keep commitments without agreement for extension could result in levy, seizure of assets, summons issuance.

(Notes, March 11, 2008, Annen Decl. Ex. 1 at US636, US638.)

> Failure to meet these commitments without securing agreement for extension could result in levy, seizure of assets, summons issuance.

(Notes, March 11, 2008, Annen Decl. Ex. 1 at US555.)

> I advised [Sunnen] that failure to keep current on [deposits] and timely file returns could result in enforced collection actions. I further advised that failure to provide the additional financial information and detailed explanations by the date promised, could also result in enforced collection actions.

(Notes, July 2, 2008, 2008, Annen Decl. Ex. 1 at US664.)

> I reminded you that failure of ACC to remain current on filing and payment of federal tax deposits as well as failure to provide the required information by July 21, 2008 could result in enforced collection actions against ACC and the other related entities.

(Letter, July 7, 2008, Annen Decl. Ex. 1 at US399–US401.)

Annen also presents evidence of ACC's communications with the IRS relating to ACC's application for a subordination agreement. ACC submitted the application requesting that the

6

IRS subordinate its tax lien to a third party "factor," a company that would purchase ACC's accounts receivable in exchange for cash to be used in ACC's operations. IRS records indicate that ACC told the IRS that the factor threatened to cut off funding unless the IRS agreed to subordinate its lien, and ACC could not continue to fund its operations without the factor. The records do not reflect whether the IRS ultimately granted or denied the application. Relevant portions of the submitted IRS records are as follows:

> [Sunnen] indicated he will be submitting a subordination application concerning [ACC's] factoring agreement. The factor has indicated they will cut off additional funding at the end of 45 days unless IRS agrees to subordinate. I advised [Sunnen] that he can submit the application, however, it is unlikely that IRS will agree to what would amount to an on-going subordination to the factor.
>
> Further, I indicated that the IRS will not process subordination applications every 45 days either. [Sunnen] acknowledged that this is an issue. . . . He will need to discuss this with [ACC] and the factor to see what arrangements can be made.

(Notes,[2] Annen Decl. Ex. 1 at US660.)

> I advised [Sunnen] that I had received his fax for a subordination application . . . but had been unable to review it. He provided a revised application. . . . The subordination application is for the factor on [ACC's] accounts receivable. Apparently [ACC] needs to continue to use the factor because [it] needs up-front capital . . . [for operational expenses]. [ACC] has significantly increased the income over the last 3 mos. Yet [ACC] is asserting [it] needs to have IRS approve a subordination . . . I advised that given those circumstances, as it now stands, I would recommend rejection of the subordination request. . . . [Sunnen] . . . understands the position of the Service at this time with respect to . . . any subordination application. [He] requested that the subordination application be put on hold until he is able to confer with [ACC]. . . . I advised that the Service would not likely approve such a request [as currently contained in the subordination application]. He indicated that the amount under the subordination plan is not firm and could be modified but he provided no details at this time.
> . . .
>
> [Sunnen] understands that no actions will be taken on the subordination application until after the meeting on 7/30/2008.

(Notes, July 2, 2008, Annen Decl. Ex. 1 at US663.)

---

[2] Annen asserts that these notes relate to a conversation that occurred on June 24, 2008. (Annen Mot. 6–7.) From the excerpted notes in the record, the Court can determine only that this conversation took place after June 5, 2008 because the notes indicate that a payment had been made on that date. (Annen Decl. Ex. 1 at US660.)

7

> I advised ... it is unlikely that the Service would even consider a subordination of the tax liens. ... You requested that I hold processing of the subordination application until you are able to discuss the issue with your client. Therefore, no actions will be taken on the application at this time.

(Letter, July 7, 2008, Annen Decl. Ex. 1 at US399–US401.)

> [Sunnen] submitted an application for subordination of the [liens] against ACC to enable [ACC] to continue to factor their accounts receivable. This application has been on hold due to the requirement to provide updated income and expense statements. ... [Sunnen] needs to discuss the subordination application because [ACC] is in a desperate situation and needs to proceed with factoring.
>
> . . .
>
> [In a] [p]hone message received from [Sunnen] again on 7/22/2008 ... [h]e indicated he really needs to discuss the subordination application as it is time critical to [ACC] at this point.
>
> . . .
>
> [Sunnen] had faxed a note on 7/18/2008 advising of the critical nature of getting a determination on the subordination as [ACC] desperately needs to factor some more [accounts receivable] to have the capital to do the start-ups on new contracts.
>
> . . .
>
> I discussed briefly with [Sunnen] the issues still outstanding that in my view affect any viable consideration for subordination of the [lien]. [He] is still working on gathering info from [ACC]. ... I reminded [him] that at present the application submitted is for an open-ended or ongoing period of time covering at least 18 mos. Consequently [ACC and its agent] are asking the Service to agree to subordinate the lien [on] an ongoing basis such that [ACC] can continue to factor the receivables, thus incurring more debt that would continue to take priority over the [lien] if we were to approve the subordination. I advised such a request would not likely be approved. After further discussion [he] asked for suggestions that might make a subordination application more viable for possible approval. I advised that it would have to contain a shorter period of time – [he] offered 6 mos. I also advised that the Service would need to secure some of the funds from any initial or subsequent factoring under a subordination paid directly to IRS. The amount offered must contain an explanation as to why [ACC] needs the remaining funds secured from the factor and not paid to IRS with very specific information provided. [He] acknowledged this and stated that he would talk to [ACC] today and expects to submit a revised subordination application with the additional information and documentation later today. I also advised that specific documentation pertaining to this factoring agreement and the terms must be included.

8

> . . .
>
> [Sunnen] stated they were still working on the data needed to revise the application and he isn't sure they will have it done and faxed over by the end of the day. I suggested that he call [IRS Revenue Officer] Fowler [to whom the case was being transferred] and advise her of the status and when he expects to fax it.

(Notes, July 23, 2008, Annen Decl. Ex. 1 at US669–US672.) The records presented by Annen end here, but the IRS submitted additional records indicating that Revenue Officer Fowler submitted ACC's subordination application in August of 2008 with a recommendation against approval. (Sherman Decl. Ex. I at US678–79.) It is not clear, however, whether the application was ever fully processed. (*Id.* at US684 (showing that the revenue officer attempted to check the status of the application in October 2008).)

The evidence submitted by the IRS also shows that Annen was aware of ACC's pending subordination application, the reason that ACC needed the application, and the fact that the IRS issued a notice of levy on July 24, 2008. The records indicate that Paul Mendelson (as ACC's principal), ACC's attorney, and ACC's agent attended a meeting with the revenue officer on July 24, 2008. According to contemporaneous IRS records, this meeting "simply consisted of [ACC's] reason for requesting a subordination." (Sherman Decl. Ex. I at US672–73.) A record entered on September 25, 2008 indicated that "R. Ammon" (sic) . . . was the attorney who came into the office [with ACC and its agent]." (*Id.* at US683.)

Another record indicates that "R. Ammon" stated to the revenue officer on October 1, 2008 that he was unaware that a lien was filed. According to the IRS record, the revenue officer then "[r]eminded him [of the] office visit he attended. [ACC's] main concern was to secure a lien subordination so [it] could secure funds from a factor." (*Id.* at US683.) These records are consistent with Revenue Officer Fowler's declaration, in which she states:

> [O]n July 24, 2008, I received a phone call from ACC's counsel John Sunnen who wanted to have a meeting later that afternoon and provide some additional

9

> information concerning ACC's request that the IRS subordinate its lien to a pre-existing factor so that it would continue to lend funds to ACC. . . .
>
> . . . Present at the meeting on July 24, 2008, was Mr. Sunnen on behalf of ACC, Paul Mendelson who was a principal of ACC, and Richard Annen who was introduced by Mr. Mendelson as his attorney. At that meeting, I stated that I was handing to John Sunnen his copy of the original final notice of intent to levy that was being mailed that day to ACC. . . . Sunnen stated that there was an urgent need for the IRS to subordinate its tax lien.
>
> . . .
>
> On October 1, 2008, Mr. Annen called again [regarding the tax levy] . . . He claimed to be unaware that a notice of lien had been filed and I reminded him that he was present at the July 24, 2008 meeting where ACC was requesting that the IRS subordinate its tax lien so that a [pre-existing] factor would continue to lend money to ACC. Additionally, I recall asking him why he was willing to lend the company money when the factor would not. Annen replied something to the effect [that] that was what his wife wanted to know as well.

(Fowler Decl. ¶¶ 4, 5, 8.)

The above evidence shows that, as of July 24, 2008, Annen was aware of the circumstances of ACC's subordination application as well as the notice of levy issued against ACC. Annen presents no evidence suggesting otherwise; in fact, Annen's declaration contains no statements relating to the elements of equitable estoppel.

### 3. *Analysis*

The Court finds that there is no genuine question of material fact as to whether Annen has satisfied the elements of equitable estoppel against the government. As explained above, in order to assert estoppel against the IRS, Annen must show that (1) the IRS made a misrepresentation; (2) Annen reasonably relied on the misrepresentation; (3) Annen suffered a detriment; and (4) the IRS engaged in affirmative misconduct.

Annen's allegation that the IRS made a misrepresentation, as well as his implication that the IRS engaged in affirmative misconduct, is simply not supported by the evidence. The parties do not dispute that the IRS issued several warnings, as shown by the IRS records discussed

10

above. However, those warnings do not constitute an agreement *not* to collect; rather, they are warnings that the IRS *would* undertake certain actions if ACC did not comply with its requests. To the extent that Annen may contend that the IRS agreed to subordinate its lien, the evidence indicates otherwise. While it is unclear whether ACC's subordination application was ever fully processed, the record clearly establishes that no subordination agreement had been reached as of the date of the PSSA.

Moreover, Annen has not—and cannot—claim to have reasonably relied on any alleged misrepresentation. As explained above, "[i]f, at the time when [Annen] acted, [he] had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." *Heckler*, 467 U.S. at 59 n.10. When Annen entered into the PSSA, the IRS had already filed the Notice of Federal Tax Lien. Even if Annen had not been present when a copy of the notice of intent to levy was hand-delivered on July 24, 2008, he "had the means by which with reasonable diligence he could acquire the knowledge" of the lien—he simply had to do a lien search.

Annen does not allege facts satisfying the elements of equitable estoppel against the government, and the evidence shows that there is no genuine question of material fact as to whether he could satisfy those elements. The Court therefore finds that equitable estoppel does not apply here.

As explained above, in the absence of equitable estoppel, the IRS's lien is superior to Annen's lien. The Court therefore finds that Defendant IRS's claim to the Funds is superior to the claim of Defendant Annen.

IV.

For the reasons discussed above, the Court **GRANTS** the IRS's Motion for Summary Judgment Against Defendant Richard Annen (Doc. 75) and **DENIES** Defendant Richard Annen's Motion for Summary Judgment Against Defendant United States (Doc. 76).

**IT IS SO ORDERED.**

_4-22-2010_
**DATED**

**EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE**